Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **NOEL A. CERVINO, JR.** | * | |
| 4716 Butler Road | | |
| Glyndon, Maryland 21071 | * | |
| Baltimore County | | |
| | * | |
| and | | |
| | * | |
| **QUEEN CITY CARRIERS, INC.** | | |
| 4716 Butler Road | * | |
| Glyndon, Maryland 21555 | | CIVIL ACTION NO.:  JFM06CV2472 |
| Baltimore County | * | |
| | | |
| *Plaintiffs* | * | |
| | | |
| v. | * | |
| | | |
| **LEROY C. NIXON** | * | |
| 18209 Oldtown Road, S.E. | | |
| Oldtown, Maryland 21555 | * | |
| Allegany County | | |
| | * | |
| | | |
| **SERVE ON:** | * | |
| | | |
| **Jeffrey S. Getty, Esquire** | * | |
| Geppert, McMullen, Paye & Getty | | |
| 21 Prospect Square | * | |
| Cumberland, Maryland 21502 | | |
| | * | |
| *Defendant* | | |
| | * | |
| and | | |
| | * | |
| **DONNA THOMAS** | | |
| 18209 Oldtown Road, S.E. | * | |
| Oldtown, Maryland 21555 | | |
| Allegany County | * | |
| | | |
| *Defendant* | * | |

and                                                    *

**INDUSTRIAL BOULEVARD FAST**                          *
**FUELING, INC.**
18209 Oldtown Road, S.E.                               *
Oldtown, Maryland 21555
Allegany County                                        *

                                                       *
**SERVE ON:**
                                                       *
**Robert A. Alderson, Resident Agent**
100 S. Liberty Street                                  *
Cumberland, Maryland 21501
                                                       *
          *Defendant*
                                                       *
and
                                                       *
**CLASSIC CAR WASH AND**
**MAINTENANCE, INC.**                                  *
18209 Oldtown Road, S.E.
Oldtown, Maryland 21555                                *
Allegany County
                                                       *

**SERVE ON:**                                          *

**Robert A. Alderson, Resident Agent**                 *
100 S. Liberty Street
Cumberland, Maryland 21501

        *       *       *       *       *       *       *       *       *       *       *       *       *

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Noel A. Cervino, Jr. ("Cervino") and Queen City Carriers, Inc. ("QCC"), by their attorneys,

Gary R. Jones, Trace G. Krueger, and Baxter, Baker, Sidle, Conn & Jones, P.A., and pursuant to 15

USCA § 78j(b), 17 C.F.R. 240.10b-5 and Federal Rule of Civil Procedure 57, hereby sue the Defendant,

Leroy C. Nixon ("Nixon") and state as follows:

2

## I. PARTIES

1.      Plaintiff Noel Cervino is an individual residing in Glyndon, Baltimore County, Maryland.

2.      Plaintiff QCC is a Maryland corporation in good standing with its business address in Glyndon, Baltimore County, Maryland. QCC's principal place of business until August, 2006 was in Cumberland, Allegany County, Maryland at 18290 Oldtown Road, SE, Oldtown, Maryland 21555-9801.

3.      Defendant Leroy Nixon is an individual residing in Oldtown, Allegany County, Maryland.

4.      Defendant Donna Thomas is an individual residing in Oldtown, Allgany County, Maryland.

5.      Defendant Classic Car Wash and Maintenance, Inc. is a Maryland corporation in good standing with its business address and principal place of business at 18290 Oldtown Road, SE, Oldtown, Maryland 21555-9801.

6.      Defendant Industrial Boulevard Fast Fueling, Inc. is a Maryland corporation in good standing with its business address and principal place of business at 18290 Oldtown Road, SE, Oldtown, Maryland 21555-9801.

## II. JURISDICTION & VENUE

7.      This Court has jurisdiction over the subject matter of this case, pursuant to 28 U.S.C.A. § 1331, because the Plaintiffs allege one of more violations of Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C.A. § 78j(b), and/or SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

8.      This Court has personal jurisdiction over the Defendants because the Defendants made the subject misrepresentations and omissions in the State of Maryland, directed those misrepresentations and omissions to the Plaintiffs, a resident of the State of Maryland and a Maryland corporation in good standing, and the Defendants resides and regularly conducts business in the State of Maryland.

9.      Venue for this case is proper in this District under 28 U.S.C. § 1391, because all or a substantial part of the events or omissions giving rise to the claim occurred in this district, and the Defendants maintain their primary residences, business addresses, and/or principal places of business in the northern division of this district.

## FACTS COMMON TO ALL COUNTS

10.     In the spring of 2005, Cervino contacted William Wiley ("Wiley") of Wiley & Associates, a business broker in Towson, Maryland, regarding buying a business in Cumberland, Maryland, QCC. QCC was owned by Nixon. Nixon also owned Defendant Classic Car Wash and Maintenance, Inc. ("CCW") at the time. QCC and CCW were both located at 18209 Oldtown Road, SE, Oldtown, Maryland 21555-9801. Defendant Industrial Boulevard and Fast Fueling, Inc. ("IBFF") was also located on the same premises as QCC and CCW.    According to records obtained from the Maryland Department of Assessments and Taxation, Defendant Thomas owned IBFF.

11.     QCC is a Maryland stock corporation that operated a transportation business pursuant to contracts with the United States Postal Service (the "Contracts").

12.     Cervino negotiated with Nixon through Wiley. A letter of intent was signed by Cervino to purchase the stock of QCC from Nixon.

4

13.     Cervino was initially represented by the Law Firm of Levin & Gann in Towson, Maryland.   Nixon was represented by H. Gregory Skidmore, Esquire ("Skidmore") and his firm, Skidmore, Alderson & Duncan (the "Skidmore Firm").

14.     In August of 2005, Skidmore suggested to Cervino that in addition to representing Nixon, the Skidmore Firm could represent Cervino in the purchase of the stock of QCC.   Skidmore told Cervino that the Skidmore Firm was a "simpler and cheaper" alternative to using a Baltimore firm.   Cervino retained the Skidmore firm in late August.

15.     The Skidmore Firm scheduled a meeting with Timothy Michaels, CPA ("Michaels") of Huber, Michaels & Company ("Huber Michaels").   Huber Michaels had provided accounting services to Nixon and QCC in the past and was familiar with the business.

16.     Prior to the sale of the stock of QCC, Cervino met with Michaels, Wiley and Nixon at the Skidmore Firm.   Records and financial data pertaining to QCC were gathered and given to Cervino by Wiley. At this meeting, the participants, including Nixon, discussed QCC and the potential sale of QCC from Nixon to Cervino.   At the time of this meeting and up until the time Cervino agreed to purchase QCC, Nixon, Thomas, IBFF and/or CCW had actual knowledge that:

- QCC was purchasing fuel at wholesale prices from Nixon's girlfriend, Donna Thomas, who owned a diesel fuel station, Industrial Boulevard Fast Fuel ("IBFF"); and that

- QCC was certifying to the United States Postal Service that QCC was paying retail charges for diesel fuel when Nixon was only actually paying wholesale charges; and that

- there was no agreement on behalf of Ms. Thomas to continue providing diesel fuel to QCC at wholesale price after the sale of QCC; and that

- IBFF had routinely written off fuel charges to QCC; and that

- QCC had not paid the IRS for federal payroll withholding since the second quarter of 2004; and that

- QCC's contracts, including but not limited to the contracts for the Milwaukee route (530M2), often required QCC to meet driving time restrictions and regulations as a requirement; and that

- QCC was unable to comply with restrictions in the contracts, so Nixon had instructed QCC drivers to falsify driving logs.

Despite having actual knowledge of the above facts, Nixon, Thomas, IBFF and/or CCW did not disclose them to Cervino at any time prior to the sale of the stock of QCC.

17. Nixon knew he was concealing key facts about QCC from Cervino. Nixon was the President and CEO of QCC. He was principally involved in completing QCC's tax returns, negotiating the purchase of fuel, reporting to the government, and handling all contractual negotiations and obligations. While IBFF was owned by Donna Thomas, it was operated on Nixon's land, managed by Nixon, and operated within a building owned by Nixon. Nixon knew these and other facts were crucially important to Cervino in making his decision whether to purchase QCC. Since disclosure of these facts would have either dissuaded Cervino from purchasing QCC or drastically reduced the price Cervino was willing to pay for the stock of QCC, Nixon knowingly, willingly, and maliciously decided not to disclose these facts to Cervino.

18. Even if Nixon did not knowingly, intentionally and maliciously fail to disclose these crucially important facts, the failure to tell Cervino about these items was so reckless that it amounts to intentional misconduct. Failing to disclose basic information about QCC's failure to pay payroll taxes for the prior two year period, failing to disclose QCC's inability to complete routes without falsifying log books, and failing to disclose fuel write offs when fuel was a major expense of QCC amounts to intentional misconduct even if Nixon was somehow kept ignorant of those facts.

19. In September, 2005, the Skidmore Firm negotiated the terms of the Agreement and advised both the seller, Nixon, and the potential buyer, Cervino.

6

20.    On September 15, 2005, the Skidmore Firm met, by conference call, with Nixon, Cervino, Michaels and Wiley.  On September 16, 2005, the Skidmore Firm drafted a basic terms memorandum for the purchase of the QCC stock.

21.    In late September, 2005, the Skidmore Firm drafted the Stock Purchase Agreement ("the Agreement"), attached as **Exhibit A**. In addition to the Agreement, the Skidmore Firm prepared a Lease, a Promissory Note (the "Note"), a Consulting Agreement, an Employment Agreement and a Post Closing Agreement.

22.    The Agreement was signed by Cervino and Nixon on October 7, 2005.  The purchase price was $1,350,000.  Cervino paid $25,000 as a deposit and executed the Note to Nixon for $200,000. Nine Hundred Fifty Thousand dollars of the purchase price was borrowed by QCC from M & T Bank and was funded on October 24, 2005.  Cervino paid $200,000 in cash toward the purchase price.

23.    Cervino assumed responsibility for the operation of QCC on October 8, 2005.  Cervino traveled daily from his home in Baltimore County to work for QCC in Cumberland, Maryland six days a week.

24.    By the end of 2005, Cervino realized that QCC was not profitable and was not producing positive cash flow.  Cervino had to borrow against a credit line with M & T Bank to pay QCC expenses.

25.    In January and February of 2006, QCC remained unprofitable.  When Cervino questioned Nixon why QCC was not producing positive cash flow, Nixon responded that QCC never made any money in the cold weather months.

26.    By mid March, QCC had borrowed $45,000 from a $50,000 line of credit with M & T Bank.

27.     On March 13, 2006, QCC received a deficiency notice from the IRS for $55,792.82 in unpaid tax payments as of September 30, 2005. The deficiency was related to unpaid taxes for federal payroll withholding. Cervino investigated the unpaid tax liability of QCC and found the following unpaid amounts, which actually totaled $71,245.63:

| 3rd quarter | 2004 | $3,682.27 |
| 4th quarter | 2004 | $1,211.11 |
| 1st quarter | 2005 | $806.39 |
| 2nd quarter | 2005 | $4,775.05 |
| 3rd quarter | 2005 | $57,381.93 |
| 4th quarter | 2005 | $3,388.88 |
| | Total | $71,245.63 |

28.     When Cervino confronted Nixon about the unpaid taxes, Nixon admitted that QCC had not made withholding payments in these quarters.

29.     Cervino discovered in March, 2006 that QCC drivers had routinely falsified drivers' logs with the approval and under instruction from Nixon. QCC was unable to comply with driving restrictions in the Milwaukee contract (route 530M2). When Cervino confronted Nixon about the falsified logs, Nixon admitted that they were, in fact, falsified with his knowledge and approval. Cervino also discovered that if the QCC drivers properly complied with driving time restrictions and regulations, several of the eight routes specified in the Contracts could not be performed in a timely manner.

30.     In March, 2006, Cervino discovered through QCC's and Nixon's accountants that fuel certifications had been falsified by Nixon/QCC and that IBFF had routinely written off large amounts of fuel charges owed to it by QCC. This greatly concerned Cervino. When he confronted Nixon about the fuel charges, Nixon indicated that QCC wrote off over $200,000 in 2005 and that the fuel write offs had been occurring for several years. Cervino correctly determined that QCC's expenses were vastly

8

understated and revenues overstated in the time prior to closing of the transaction in October, 2005, and for several years prior to that. The result was that QCC, on financial statements submitted by Nixon to Cervino, appeared to be a viable company when in fact it was not.

31.     In May, 2006 the Chicago route (HCR606E) was non-renewed by the USPS and the Milwaukee route (530M2) was in jeopardy of being lost due to performance issues and Defendant's failure to comply with United States Postal Service regulations.

32.     In late May, QCC was notified by M & T Bank that both the loan for the purchase price of QCC stock and the loan for QCC's credit line were being transferred to M & T Bank's debt collection department (special assets). QCC had remained current on all payments to M & T Bank.

33.     On July 5, 2006, QCC and Cervino were notified by M & T that QCC was in default of its obligations under the loan documents. M & T Bank demanded payment in full of all outstanding indebtedness owed under the loan documents – at that time totaling $994,139.41.

34.     Between August 4 and August 8, 2006 M & T Bank seized QCC's assets.

## COUNT I
## Securities Fraud in Violation of 15 USCA § 78j(b) and 17 C.F.R. 240.10b-5

35.     The allegations contained in paragraphs 1 through 34 are adopted by reference and incorporated herein.

36.     The Defendants made misrepresentations and omissions to the Plaintiff about QCC prior to the sale of QCC stock on October 7, 2005.

37.     The Defendants' misrepresentations and omissions concerned material facts.

38.     The Defendants made these misrepresentations and omissions to the Plaintiff knowingly, or with reckless disregard for the truth, with the intent to defraud or deceive the Plaintiff.

9

39.     The Defendants' misrepresentations and omissions to the Plaintiff were made in connection with the sale of securities, namely shares of stock in QCC.

40.     In making the misrepresentations and omissions to the Plaintiff, the Defendants utilized the United States mails, and other devices and instrumentalities of interstate commerce such as telephone lines.

41.     The Plaintiff justifiably relied upon the Defendants' misrepresentations about QCC. Additionally, the Defendants were under a duty to fully disclose all material facts regarding QCC, which the Defendants neglected, omitted, and failed to do.  The Defendants' failure to disclose constituted a material misrepresentation to the Plaintiff regarding QCC, and QCC's stock's value upon which the Plaintiff justifiably relied. As a consequence of that reliance, the Plaintiff purchased QCC, and suffered damages as a result.

42.     The Defendants' material misrepresentations and omissions proximately caused the Plaintiff to suffer significant monetary damages, as well as the loss of employment opportunities and time.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants, Leroy Nixon, Donna Thomas, IBFF and CCW for compensatory damages in the amount of Two Million Dollars (**$2,000,000**), with interest and costs.

## COUNT II
## Violation of Maryland Securities Act

43.     The allegations in paragraphs 1-42 are incorporated by reference as if fully set forth herein.

44.     The shares of QCC stock that the Plaintiff purchased from Nixon are securities as defined by Section 11-101(o) of the Maryland Corporations and Associations Article.

45.     Prior to the negotiation and sale of the shares to the Plaintiff, Nixon did not register the shares with the office of the Attorney General for the State of Maryland as required by Section 11-501 of the Maryland Corporations and Associations Article.

46.     In violation of Section 11-703 of the Corporations and Associations Article, the Defendant sold the stock in QCC to the Plaintiff by making untrue statements of material fact and omitting material facts necessary for the Plaintiff to make an informed decision to purchase QCC.  Thomas, IBFF and CCW also made untrue statements of material fact and omitted material facts required for an informed decision by the Plaintiff.

47.     When the Plaintiff purchased QCC, he did not know that the statements the Defendants made to him were false, or that the Defendants was omitting key material facts.

48.     The Plaintiff justifiably relied on the material misrepresentations and omissions made to him by the Defendants.

49.     The Plaintiff exercised reasonable care and could not have known that the Defendants were making material untruths and omissions about QCC prior to sale.

50.     As a result of the Defendants' violations of the Maryland Securities Act, the Plaintiff has suffered damages, including the monies paid for QCC, interest, costs and attorneys' fees.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants, Leroy Nixon, Donna Thomas, IBFF and CCW for compensatory damages in the amount of Two Million Dollars (**$2,000,000**), with interest, costs and attorneys' fees.

## COUNT III
### Breach of Contract

51.     The allegations in paragraphs 1-50 are incorporated by reference as if fully set forth herein.

52.     On October 7, 2005, the Plaintiff and Defendant Nixon entered into the Agreement, whereby the Plaintiff agreed to purchase and Nixon agreed to sell all of the issued and outstanding common stock in QCC. A true and authentic copy of the aforementioned Agreement is attached as **Exhibit A** and incorporated by reference.

53.     Under the Agreement, Defendant Nixon was obligated to the Plaintiff to fully and fairly disclose all pertinent information about QCC, report unpaid tax liabilities, advise of all liabilities and assets and otherwise deal in good faith.

54.     Defendant Nixon materially breached the Agreement by failing to meet his obligations under the Agreement. Furthermore, Defendant Nixon breached the implied covenant of good faith and fair dealing.

55.     As a result of Defendant Nixon's breaches of the Agreement, the Plaintiff has suffered damages, including the monies paid for QCC, interest, costs and attorneys' fees.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendant, Leroy Nixon, for compensatory damages in the amount of Two Million Dollars (**$2,000,000**), with interest and costs.

## COUNT IV
## Breach of Express Warranty

56.     The allegations in paragraphs 1-55 are incorporated by reference as if fully set forth herein.

57.     On October 7, 2005, the Plaintiff and Defendant Nixon entered into the Agreement, whereby the Plaintiff agreed to purchase and the Defendant agreed to sell all of the issued and outstanding common stock in QCC.

12

58.     Pursuant to the Agreement, paragraph 7(g), Defendant Nixon expressly warranted to the Plaintiff that the Financial Statements supplied to the Plaintiff "fairly present[ed] the financial position of the Corporation as of the dates indicated and the results of operations and changes in financial position for the periods indicated."

59.     Contrary to Defendant Nixon's express warranty in the Agreement, the Financial Statements provided to the Plaintiff did not fairly present QCC's financial position in that they contained material misrepresentations and omissions about QCC.

60.     Pursuant to the Agreement, paragraph 7(h), Defendant Nixon expressly warranted to the Plaintiff that QCC "has paid all taxes, assessments, governmental charges, penalties, interest and fines due or claimed to be due as of the time of Closing (including, without limitation, taxes on properties, income, franchise, licenses, sales and payroll) by any Federal, State or local authority."

61.     Contrary to Defendant Nixon's express warranty in the Agreement, QCC had failed to pay substantial amounts of taxes to the federal government at the time the Plaintiff purchased QCC from the Defendant Nixon. Specifically, QCC had not satisfied its federal payroll tax liability since the second quarter of 2004.

62.     At all relevant times, the express warranties in the Agreement were the basis for the purchase of QCC by the Plaintiff.

63.     The Plaintiff notified Defendant Nixon of the breaches of warranty within a reasonable time of discovering the breaches and prior to the filing of this action.

64.     As a result of the Defendant's breaches of the express warranties in the Agreement, the Plaintiff has suffered damages, including the monies paid for QCC, interest, costs and attorneys' fees.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendant, Leroy Nixon, for compensatory damages in the amount of Two Million Dollars (**$2,000,000**), with interest and costs.

13

## COUNT V
### Fraud

65.     The allegations in paragraphs 1-64 are incorporated by reference as if fully set forth herein.

66.     The Defendants made false representations of materials facts to the Plaintiff. Specifically, the Defendants told the Plaintiff:

- QCC's income tax liabilities were paid and current prior to the Plaintiff's purchase of QCC; and that

- QCC was profitable; and that

- QCC's fuel expenses had been paid by cash at the end of each month by payments made from QCC to IBFF; and that

- QCC's performance on its current contracts was within the current operational capabilities of the business, in spite of the fact that QCC drivers had been forced to falsify log books in order to meet the contractual driving requirements in many cases; and

- other false representations of material fact.

The Defendants' false statements to the Plaintiff were crucial and highly important to the Plaintiff's decision to purchase QCC's stock from Defendant Nixon.

67.     When the Defendants made these representations to the Plaintiff, knew that they were false, or made the representations with such reckless disregard for the truth that knowledge of the falsity of the statements is necessarily imputed to the Defendants. Similarly, when the Defendants failed and omitted to disclose crucial information to the Plaintiff, that was done by the Defendants intentionally or with reckless disregard for the truth.

68.     Defendant Nixon's false statements were made with actual malice. As the President and CEO of QCC, as well as the individual primarily involved with negotiating the contracts, paying federal

14

taxes, and overseeing all significant aspects of managing QCC, Nixon knew the financial condition of QCC at the time he was trying to sell QCC's stock to the Plaintiff. Nixon's misrepresentations about QCC were made with malice and to deceive the Plaintiff, coerce him into purchasing QCC's stock, and suffer damages in the form of lost capital, property, time, and opportunity.

69.     Defendant Thomas' false statements were made with actual malice. As the President and owner of IBFF, as well as Nixon's companion, she was intimately aware of the relationship between IBFF and QCC. Thomas and IBFF's misrepresentations about QCC were made with malice and to deceive the Plaintiff, coerce him into purchasing QCC's stock, and suffer damages in the form of lost capital, property, time and opportunity.

70.     The Defendants made the representations and omissions to defraud the Plaintiff and to induce him to purchase QCC's stock at an inflated price. The Defendants' misrepresentations and omissions were made deliberately with the intent to deceive the Plaintiff.

71.     The Plaintiff relied on the Defendants' false statements, misrepresentations and omissions about QCC justifiably. The Plaintiff's justified reliance on the Defendants statements and omissions induced the Plaintiff to purchase the stock of QCC.

72.     As a direct and proximate result of the Plaintiff's justifiable reliance on the Defendants' fraudulent and/or misrepresentations, the Plaintiff suffered damages.

**WHEREFORE**, the Plaintiffs demand judgment against the Defendants Leroy Nixon, Donna Thomas, IBFF and CCW for compensatory damages in the sum of Two Million Dollars (**$2,000,000**), with interest and costs. The Plaintiffs further demand punitive damages against Defendants Leroy Nixon, Donna Thomas, IBFF and CCW, in the amount of Two Million Dollars (**$2,000,000**).

## COUNT VI
### Negligent Misrepresentation

15

73.     The allegations in paragraphs 1-72 are incorporated by reference as if fully set forth herein.

74.     The Defendants negligently asserted false statements to the Plaintiff about QCC prior to the sale of QCC stock on October 7, 2005, and the Defendants owed the Plaintiff a duty to fully and accurately disclose information about QCC.

75.     The Defendants intended for the Plaintiff to act or rely on the negligent assertions made concerning QCC.  Specifically, the Defendants intended for the Plaintiff to agree to purchase QCC's stock at the price offered by Defendant Nixon.

76.     The Defendants knew or should have known that the Plaintiff would rely on the negligent assertions and statements that induced the Plaintiff to agree to purchase QCC's stock.

77.     Acting in reliance upon the Defendants' statements and assertions about QCC, the Plaintiff purchased QCC's stock at an inflated price and incurred damages as a direct and proximate result of the Defendants' negligence.

**WHEREFORE**, the Plaintiffs demand judgment against Defendants Leroy Nixon, Donna Thomas, IBFF and CCW, for compensatory damages in the amount of Two Million Dollars (**$2,000,000**) with interest and costs.

## COUNT VII
### Rescission

78.     The Plaintiff incorporates by reference the allegations in paragraphs 1-77.

79.     The Plaintiff was induced into agreeing to purchase QCC because of the Defendants' fraud and/or negligent misrepresentations regarding QCC.

80.     Pursuant to the Agreement entered into between the Plaintiff and Defendant Nixon on October 7, 2005, the Plaintiff purchased the stock of QCC from the Defendant for $1,350,000.

81.     In order to purchase QCC, the Plaintiff borrowed $950,000 from M & T Bank, which was funded on October 24, 2005.  The Plaintiff also executed a Note to the Defendant for $200,000 of the purchase price and paid $200,000 in cash.

82.     After purchasing QCC, the Plaintiff discovered that the Defendant had fraudulently and/or negligently misrepresented key facts regarding QCC as described above.

83.     The Defendant owed a duty of care to the Plaintiff.  This duty required the transmittal of accurate information from the Defendant to the Plaintiff.  The Defendant's failure to advise the Plaintiff that there was an outstanding tax liability, that the fuel certifications were false, that expenses were understated and revenues overstated and that the drivers' logs were falsified was a material breach of the Defendant's duty to the Plaintiff and a material breach of the Agreement.

84.     The Defendant was fraudulent and/or negligent in the assertion of these false statements and omissions to the Plaintiff.

85.     The Defendant's fraudulent and/or negligent statements and omissions to the Plaintiff were made with the intent that the Plaintiff would act and rely upon those statements and omissions in deciding to purchase the stock of QCC.

86.     The Defendant knew that the Plaintiff would rely on his false and/or negligent statements and omissions in deciding whether to purchase QCC, and the Plaintiff was, in fact, relying upon the Defendant's fraudulent and/or negligent misrepresentations when Plaintiff purchased the stock of QCC on October 7, 2005.

87.     The Plaintiff's reliance on the Defendant's statements and omissions was justified because of the many assurances given by the Defendant.

17

88.     In early 2006, the Plaintiff advised the Defendant promptly of his willingness to return

QCC's stock to the Defendant and of the Plaintiff's intention to rescind the transaction. The Plaintiff was

unconditionally willing to return to the Defendant both the stock of QCC, as well as any benefits and/or

profits that may have accrued to the Plaintiff's benefit as a result of the transaction. The Defendant

refused, and continues to refuse, to return to the Plaintiff the $1,350,000 the Plaintiff paid the Defendant

for QCC stock.

89.     As soon as the Plaintiff discovered the fraud and/or negligent misrepresentations

perpetrated by the Defendant, he exercised his right under the law to rescind the sale promptly.

90.     As a result of the Defendant's fraudulent and/or negligent misrepresentations about QCC

prior to the Plaintiff's purchase, the Plaintiff is entitled to rescind the transaction and to recover all of the

monies paid to the Defendant.

**WHEREFORE**, Plaintiff Cervino demands that the sale of QCC's stock, entered into between
Cervino and Nixon, be rescinded and to award to Cervino the return of all monies paid by Cervino to
Nixon under the contract with interest, costs, and attorneys' fees.

 

Gary R. Jones (Federal Bar No. 06402)
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202
Telephone: (410) 230-3800
FAX: (410)230-3801
E-mail: grj@bbsclaw.com

 

Trace G. Krueger (Federal Bar No. 27479)
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202
Telephone: (410) 230-3800

18

FAX: (410)230-3801
E-mail: tk@bbsclaw.com
*Attorneys for Plaintiffs, Noel Cervino and Queen
City Carriers, Inc.*

## DEMAND FOR JURY TRIAL

The Plaintiffs demand a jury trial pursuant to FRCP 8(b).

_____
Gary R. Jones (Federal Bar No. 06402)
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202
Telephone: (410) 230-3800
FAX: (410)230-3801
E-mail: grj@bbsclaw.com

_____
Trace G. Krueger (Federal Bar No. 27479)
Baxter, Baker, Sidle, Conn & Jones, P.A.
120 E. Baltimore Street, Suite 2100
Baltimore, Maryland 21202
Telephone: (410) 230-3800
FAX: (410)230-3801
E-mail: tk@bbsclaw.com
*Attorneys for Plaintiffs, Noel Cervino and Queen City Carriers, Inc.*